

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-4-2009

# Toll Bros Inc v. Readington

Precedential or Non-Precedential: Precedential

Docket No. 06-1053

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Toll Bros Inc v. Readington" (2009). *2009 Decisions.* Paper 1810.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1810

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-1053
_____

TOLL BROS., INC.,

Appellant

v.

TOWNSHIP OF READINGTON; MAYOR AND
COMMITTEE FOR THE TOWNSHIP OF READINGTON,
individually and in their official capacities; TOWNSHIP OF
READINGTON PLANNING BOARD; MEMBERS OF THE
TOWNSHIP OF READINGTON PLANNING BOARD,
individually and in their official capacities; JULIA C. ALLEN,
individually and in her official capacity; RONALD P.
MONACO, individually and in his official capacity; BEATRICE
MUIR, individually and in her official capacity; GERARD J.
SHAMEY, individually and in his official capacity; FRANK L.
GATTI, individually and in his official capacity; JOHN AND
JANE DOES 1-20; ABC MUNICIPAL AGENCIES 1-10,
fictitious agencies


_____


On Appeal from the United States District Court
for the District of New Jersey
(No. 04-cv-06043)
District Judge:  Hon. Garrett E. Brown, Jr., Chief Judge

Argued: Tuesday, January 23, 2007

Before: SCIRICA, Chief Judge, FUENTES and CHAGARES,
Circuit Judges.

_____

(Filed: February 4, 2009)

Darren H. Goldstein [Argued]
James A. Kozachek
Albert M. Belmont, III
Carl S. Bisgaier
Flaster Greenberg, P.C.
1810 Chapel Avenue West
Cherry Hill, NJ 08002

Counsel for Appellant

Valerie J. Kimson [Argued]
Susan A. Lawless
Purcell, Ries, Shannon, Mulcahy & O'Neill
One Pluckemin Way
Suite 210, P.O. Box 754
Bedminster, NJ 07921

John M. Bowens, Esq.
Schenck, Price, Smith & Smith
10 Washington Street
P.O. Box 905
Morristown, NJ 07963-0905

Counsel for Appellees

_____

OPINION OF THE COURT
_____

CHAGARES, Circuit Judge.

We consider whether a real estate developer with an option to buy a parcel of land has standing to challenge zoning restrictions that prevent its planned development from going forward. We hold

2

that it does.

I.

Appellant Toll Brothers, Inc. describes itself as "the nation's leading builder of luxury homes . . . ." <u>See</u> Toll Brothers, http://www.tollbrothers.com (last visited January 15, 2009).[1] Toll Brothers prides itself on developing communities in prime locations; it carefully chooses "the most scenic areas that offer a blend of rural charm and suburban convenience." <u>Id.</u> In early 2001, Toll Brothers found just such a setting on a 160-acre tract of land in the Township of Readington, New Jersey ("the Township"). Toll Brothers entered into an option contract with the tract's owner, Readington Properties, LLC.

Pursuant to the contract, Readington Properties granted Toll Brothers an exclusive option to buy the tract at a fixed price. In exchange, Toll Brothers promised to make periodic payments to Readington Properties. The original contract stated a five-year option with an expiration date of January 2006. Subsequent amendments have extended the option period, and Toll Brothers' exclusive option remains in force. During the life of the option, Readington Properties cannot "enter into any lease, agreement of sale," or any other agreement affecting the property. Appendix ("App.") 203. In addition, Toll Brothers has the right to come onto the property "to perform engineering, environmental and such other feasibility studies" as it deems necessary. App. 200.

At the time of the contract's formation, the Township's zoning laws classified part of the tract as "research-office," and part as "rural-residential." The rural-residential classification allowed for "development of detached single-family dwelling units,

---

[1]"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." <u>Warth v. Seldin</u>, 422 U.S. 490, 501 (1975); <u>see</u> <u>Bennett v. Spear</u>, 520 U.S. 154, 168 (1997). Our recitation of the facts reflects this standard.

3

farm and agricultural uses, and open space and parks." App. 45. Residential development in this zone could not exceed one unit per three acres. In the research-office zone, "general office development" was permitted. Id.

Toll Brothers quickly began to formulate plans for both the rural-residential and research-office portions of the property. For the rural-residential zone, the company "engaged in preliminary planning" to develop housing "for families with children." App. 46, 49. As to the research-office zone, Toll Brothers drafted plans for an office park. For whatever reason, the office plans advanced more rapidly than the residential plans. In May 2002, Toll Brothers submitted a formal application to the Township Planning Board requesting approval for construction of an office development. Toll Brothers claims that this proposal was consistent with the Township's zoning ordinance "and with the general character" of the area. App. 46.

The Township did not approve Toll Brothers' application. Instead, it passed an ordinance rezoning the entire tract "agricultural-residential." The agricultural-residential zone allowed for just three uses by right: "(1) farms; (2) open space and parks; and (3) residential uses at one residential dwelling per six acres." App. 47. As a result, office parks were prohibited. The requirement of *six acres* per dwelling, according to Toll Brothers, made any residential development economically unfeasible. Toll Brothers' development plans thus have been thwarted.

Toll Brothers contends that this change in law was no ordinary zoning decision. It was instead part of a nefarious plot hatched by Township officials to "reduce the fair market value of properties held by disfavored landowners." App. 33. By frustrating the lawful plans of Toll Brothers and other developers, Township officials sought to "drive down the value of the [targeted] propert[ies] and acquire [them] cheaply at . . . price[s] below their fair market values." App. 36. They also "intended to discriminate against families with children . . . in an effort to reduce [their] residential opportunities" within the Township. App. 41-42.

4

Toll Brothers claims the Township's actions have caused it considerable injury. The company is in the real estate development business, but the Township has prevented all profitable development of the Readington Properties parcel. Toll Brothers is maintaining its option by rendering periodic payments to Readington Properties. If and when the Township approves Toll Brothers' plans, the company still intends to exercise its option. In the meantime, Toll Brothers has spent considerable amounts of money on planning, including fees for "architects and other professionals." App. 291. In addition to these "sunk costs," Toll Brothers has also lost out on the potential profits.

In August 2002, Toll Brothers filed a lawsuit against the Township in New Jersey Superior Court. The complaint alleged violations of the New Jersey Municipal Land Use Law, N.J. Stat. Ann. §§ 40:55D-1 to -163; the Equal Protection Clause; the Due Process Clause; the Takings Clause; equivalent provisions of the New Jersey Constitution; and the public policy and law of New Jersey as expressed in the state Supreme Court's Mount Laurel decisions.[2] That action remains pending.

In December 2004, Toll Brothers brought this suit against the Township, the Township Committee, the Township Planning Board, and various Township officials (collectively, "defendants"). The allegations in this case are quite similar to the claims pending in state court, but they do not overlap completely. In this case, Toll Brothers brings claims under the Equal Protection Clause; the Due Process Clause; the Takings Clause; The Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601-31; the New Jersey Law Against Discrimination, N.J. Stat. Ann. §§ 10:5-1 to -49; the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1961-66; and New Jersey's RICO Act, N.J. Stat. Ann. §§ 2C:41-1 to -6.2. Toll Brothers seeks an order "[i]nvalidating and setting aside" the Township's zoning ordinance, an order "enjoining Defendants . . . from enforcing" the ordinance, and

---

[2]See generally S. Burlington County NAACP v. Twp. of Mount Laurel, 456 A.2d 390 (N.J. 1983); S. Burlington County NAACP v. Twp. of Mount Laurel, 336 A.2d 713 (N.J. 1975).

money "damages sustained as a result of Defendants' illegal actions." App. 67.

The defendants moved to dismiss Toll Brothers' complaint for, *inter alia*, lack of standing.[3]  Toll Brothers opposed the motion and, in the alternative, sought leave to file an amended complaint. In an unreported decision, the District Court granted the motion to dismiss.  See Toll Bros. v. Twp. of Readington, No. 04-6043, 2005 U.S. Dist. LEXIS 25793 (D.N.J. Oct. 31, 2005).  The court found it significant that Toll Brothers was "the owner of an unexercised option."  Id. at *14.  It noted that a favorable decision would still leave Toll Brothers "free to elect not to exercise the option."  Id. Thus, the court concluded, Toll Brothers' claimed injury was "not concrete and particularized, nor [was] it likely to be redressed by a favorable decision."  Id. at *14-*15 (quotation marks omitted). Independent of that analysis, the court also pointed out that Toll Brothers' complaint alleged discrimination against families with children.  These families, however, were not parties.  Id. at *12. As a result, the court concluded that Toll Brothers lacked third-party standing to assert the families' rights.  Id.  The court did not specifically consider Toll Brothers' request for leave to amend the complaint in its decision, but the court squarely rejected the request in its opinion denying Toll Brothers' motion for reconsideration. This appeal followed.

II.

---

[3]The defendants' motion to dismiss also raised the issue of Colorado River abstention.  See Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976).  Under Colorado River, the threshold question is whether a parallel state proceeding raises "substantially identical claims [and] nearly identical allegations and issues."  Yang v. Tsui, 416 F.3d 199, 204 n.5 (3d Cir. 2005) (quotation marks omitted).  If so, then the court must consider the relative inconvenience of federal litigation, the need to avoid piecemeal adjudication, and the order in which the actions were filed.  See Colorado River, 424 U.S. at 818.  We note the Colorado River issue, but leave it for the District Court to address in the first instance.

Toll Brothers alleged that the District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332 and supplemental jurisdiction over its state law claims pursuant to 28 U.S.C. § 1367. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

We exercise plenary review over the District Court's dismissal of the complaint for lack of standing. See Goode v. City of Philadelphia, 539 F.3d 311, 316 (3d Cir. 2008); ACLU-NJ v. Twp. of Wall, 246 F.3d 258, 261 (3d Cir. 2001). We review the District Court's denial of Toll Brothers' request for leave to file an amended complaint for abuse of discretion. Winer Family Trust v. Queen, 503 F.3d 319, 325 (3d Cir. 2007).

III.

Article III of the Constitution limits federal "judicial Power" to the adjudication of "Cases" or "Controversies." U.S. Const. art. III, § 2. This limitation is essential to our system of separated powers. See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 473-74 (1982); see also Hein v. Freedom From Religion Found., Inc., 551 U.S. —, 127 S. Ct. 2553, 2570 (2007) (plurality opinion). In cases involving state or local government, "it also serves to protect and preserve the principle of dual sovereignty" embedded in our founding charter. Storino v. Borough of Point Pleasant Beach, 322 F.3d 293, 300 (3d Cir. 2003). Without a case-or-controversy requirement, the judicial power would "'extend[] to every question under the constitution,'" and "'the other departments would be swallowed up by the judiciary.'" DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006) (quoting 4 Papers of John Marshall 95 (C. Cullen ed. 1984)) (emphasis removed). With the case-or-controversy requirement, on the other hand, courts stay confined to their "proper—and properly limited—role," Warth v. Seldin, 422 U.S. 490, 498 (1975), of "decid[ing] on the rights of individuals," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803). There is, therefore, "'[n]o principle . . . more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'" Raines v. Byrd, 521 U.S. 811, 818 (1997) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37

7

(1976)).

Courts enforce the case-or-controversy requirement through the several justiciability doctrines that "'cluster about Article III.'" Allen v. Wright, 468 U.S. 737, 750 (1984) (quoting Vander Jagt v. O'Neill, 699 F.2d 1166, 1178-79 (D.C. Cir. 1983) (Bork, J., concurring)). They include standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions. See DaimlerChrysler, 547 U.S. at 352; Erwin Chemerinsky, Federal Jurisdiction § 2.1 (5th ed. 2007). "[P]erhaps the most important of these doctrines" is standing. Allen, 468 U.S. at 750.

The "irreducible constitutional minimum" of Article III standing consists of three elements. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered a "concrete," "particularized" injury-in-fact, which must be "actual or imminent, not conjectural or hypothetical." Id. (quotation marks omitted). Second, that injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Id. (quotation marks and alterations omitted). Third, the plaintiff must establish that a favorable decision likely would redress the injury. Id.; see AT&T Commc'ns of N.J., Inc. v. Verizon N.J., Inc., 270 F.3d 162, 170-71 (3d Cir. 2001).

## A.

While all three of these elements are constitutionally mandated, the injury-in-fact element is often determinative.[4] Under

---

[4]See Teva Pharm. USA, Inc. v. Novartis Pharm. Corp., 482 F.3d 1330, 1337 (Fed. Cir. 2007) ("Of the three standing requirements, injury-in-fact is the most determinative."); Nat'l Wildlife Fed'n v. Hodel, 839 F.2d 694, 704 (D.C. Cir. 1988) (describing the injury-in-fact prong as "the core of standing"); Gregory P. Magarian, Note, Fighting Exclusion from Televised Presidential Debates: Minor Party Candidates' Standing to Challenge Sponsoring Organizations' Tax-Exempt Status, 90 Mich.

it, the plaintiff must suffer a palpable and distinct harm. See Allen, 468 U.S. at 751. That harm "must affect the plaintiff in a personal and individual way." Lujan, 504 U.S. at 560 n.1. The injury can be widely shared, FEC v. Akins, 524 U.S. 11, 24 (1998), but it must nonetheless be concrete enough to distinguish the interest of the plaintiff from the generalized and undifferentiated interest every citizen has in good government. See Lujan, 504 U.S. at 573-74; Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 220-21 (1974). In this way, injury-in-fact "keeps the judicial branch from encroaching on legislative prerogatives, thereby preserving the separation of powers." Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 291 (3d Cir. 2005); see also John G. Roberts, Jr., Article III Limits on Statutory Standing, 42 Duke L.J. 1219, 1224 (1993) ("The need to insist upon meaningful limitations on what constitutes injury for standing purposes . . . flows from an appreciation of the key role that injury plays . . . in a limited and separated government.").

The critical issue for us is whether the Township's rezoning of the Readington Properties parcel has cognizably injured Toll Brothers, an optionee with a plan to develop the property.[5] No

---

L. Rev. 838, 844 n.45 (1992) ("[C]ourts rarely recognize an injury as cognizable and proceed to deny standing on one of the other constitutional grounds.").

[5]We note that Toll Brothers seeks both injunctive relief and damages. Standing, the Supreme Court has stated, "is not dispensed in gross." Lewis v. Casey, 518 U.S. 343, 358 n.6 (1996). Toll Brothers "must demonstrate standing separately for each form of relief sought." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 185 (2000) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983)). This is because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974). Here, though, Toll Brothers claims both past and present injury from the Township's zoning ordinance. So long as both the zoning ordinance and Toll Brothers' option remain in force, the standing

9

binding authority directly addresses an optionee's standing to challenge zoning restrictions. Three decisions of our sister courts of appeals, however, indicate that an optionee with a plan to develop the underlying property suffers the requisite injury from zoning restrictions that block the planned development. See Scott v. Greenville County, 716 F.2d 1409, 1412, 1415 (4th Cir. 1983) (holding that a real estate developer who "acquired a purchase option for the land; . . . put together a partnership to pursue the project; and . . . obtained earmarking of federal subsidy funds" had standing to challenge zoning restrictions that prevented construction of multi-family low-income housing); Chipanno v. Champion Int'l Corp., 702 F.2d 827, 829, 831-32 (9th Cir. 1983) (concluding that the holder of "an option to purchase certain timber lands in Oregon" had standing to challenge defendants' conspiracy "to eliminate competition, fix prices, and allocate timber from" Oregon lands); Huntington Branch, NAACP v. Town of Huntington, 689 F.2d 391, 392, 394-95 (2d Cir. 1982) (holding that "a non-profit housing assistance corporation" with "an option to purchase a 14.6 acre tract" and a plan to develop the property had standing to challenge a local zoning ordinance as racially discriminatory). In addition, two Supreme Court decisions, while not directly on point, provide useful guideposts.

The first is Warth v. Seldin, 422 U.S. 490 (1975). Warth involved a challenge to an exclusionary zoning ordinance in Pennfield, New York. One of the many plaintiffs was an association of "firms engaged in the development and construction of residential housing" in the area. Id. at 514. The association

---

analyses for both forms of relief are identical. We will therefore analyze them together.

Also, Toll Brothers' complaint contains eleven separate claims, and the company must "demonstrate standing for each claim [it] seeks to press." DaimlerChrysler, 547 U.S. at 352. All the claims, however, challenge the Township's rezoning of the Readington Properties parcel, and they all allege precisely the same injuries to Toll Brothers. As such, a claim-by-claim discussion of Toll Brothers' constitutional standing is unnecessary.

claimed the ordinance "had deprived some of its members of substantial business opportunities and profits." Id. at 515 (quotation marks omitted). The Supreme Court, however, found these allegations insufficient to establish injury-in-fact. The association "refer[red] to no specific project of any of its members that [was] precluded . . . by the ordinance," and there was "no averment that any member ha[d] applied . . . for a building permit or a variance with respect to any current project." Id. at 516. As a result, the association "failed to show the existence of any injury to its members of sufficient immediacy . . . to warrant judicial intervention." Id.

The second Supreme Court decision is Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977). The plaintiff there was a nonprofit corporation seeking to develop low-income housing in the Village of Arlington Heights, Illinois. Id. at 256. The developer entered into a 99-year lease on a parcel within the Village, and it also contracted to purchase the parcel. Id. The sale was contingent on the developer "securing zoning clearances from the Village and . . . housing assistance from the Federal Government." Id. When the Village denied the developer's request for rezoning, the developer brought an equal protection challenge. Id. at 258-59. The Supreme Court first noted that injunctive relief "would not . . . guarantee that [the project would] be built." Id. at 261. After all, the developer "would still have to secure financing, qualify for federal subsidies, and carry through with construction." Id. The developer, though, had a "detailed and specific" plan, and, as such, the Court was "not required to engage in undue speculation as a predicate for finding that the plaintiff ha[d] the requisite personal stake in the controversy." Id. at 261-62. The Village claimed the developer had "suffered no economic injury" because it was "not the owner of the property in question," and it "owe[d] the owners nothing if rezoning [was] denied." Id. at 262. The Court disagreed, noting that the developer had "expended thousands of dollars on the plans for [the project] and on the studies submitted to the Village in support of the petition for rezoning." Id. If rezoning was not granted, "many of these plans and studies [would] be worthless." Id. The developer thus established cognizable economic injury. Id.

11

Both cases are instructive here. First, Toll Brothers' alleged injuries are far more particularized and concrete than those of the Warth homebuilders. For example, where the Pennfield ordinance prevented none of the Warth homebuilders from developing any particular project, 422 U.S. at 516, the Township's agricultural-residential zone has thwarted Toll Brothers' specific development plans. Where none of the Warth homebuilders "ha[d] applied . . . for a building permit or a variance with respect to any current project," id., Toll Brothers has submitted a formal application to construct an office development on the Readington Properties parcel. And, perhaps most significant of all, where the Warth homebuilders alleged only unspecified losses of "business opportunities and profits," id. at 515, Toll Brothers points to a lost opportunity to develop a specific tract of land for which it holds an exclusive option to buy.[6] Accordingly, Toll Brothers' injuries are more distinct and immediate than those of the Warth plaintiffs.

Toll Brothers' alleged injuries also bear a strong resemblance to the injuries of the developer in Arlington Heights. Both plaintiffs had "detailed and specific" plans for the restricted properties. See Arlington Heights, 429 U.S. at 261. The Arlington Heights developer "expended thousands of dollars" on plans and studies to support its rezoning petition. See id. at 262. So too has Toll Brothers paid substantial sums in planning its proposed developments, seeking approval for its office development, and maintaining its option. Just as in Arlington Heights, these front-end expenditures remain "worthless" so long as a restrictive zoning ordinance remains in force. See id. ("[I]t is inaccurate to say that

---

[6]Some have read Warth "to leave substantial latitude for builders to obtain standing in other cases: the minimal property interest necessary to apply for a zoning variance—*such as a conditional contract or option*—would probably be sufficient to establish the requisite concrete dispute." The Supreme Court, 1974 Term: Standing to Challenge Exclusionary Zoning Ordinances, 89 Harv. L. Rev. 189, 194 (1976) (emphasis added). Indeed, the New Jersey Municipal Land Use Law permits "the holder of an option or contract to purchase" to apply for a zoning variance. N.J. Stat. Ann. § 40:55D-4.

[the plaintiff] suffers no economic injury from a refusal to rezone . . . . [where it] has expended thousands of dollars on the plans for [the property] and on the studies submitted . . . in support of the petition for rezoning."). In addition, both the Village's ordinance in Arlington Heights and the Township's ordinance stand as "absolute barrier[s]" to moving forward with construction and recouping up-front costs. See id. at 261. These parallels strongly indicate that Toll Brothers has satisfied the injury requirement.

Yet, as the defendants point out, there are differences between the harm alleged in Arlington Heights and the harm alleged in this case. The Arlington Heights developer had a 99-year lease on the restricted property and a conditional contract to purchase the land. See id. at 256. The developer's leasehold was an estate in land. It gave the developer a present possessory interest in the property. See William B. Stoebuck & Dale A. Whitman, The Law of Property 74-77 (3d ed. 2000). As such, the Arlington Heights developer could show injury-in-fact based on harm to its own proprietary interest in the tract itself. Viewed this way, Arlington Heights fits squarely within the "substantial body of law recognizing that the owner of an interest in [real] property has standing to challenge [zoning] restriction[s]" that affect its development. von Kerssenbrock-Praschma v. Saunders, 48 F.3d 323, 326 (8th Cir. 1995) (citing cases).

Here, on the other hand, Toll Brothers is neither a lessee nor a contract purchaser. It has only an option to buy. Although that option does give Toll Brothers "an inchoate right to acquire the land which . . . [is] protected in equity," Toll Brothers does not have any present interest in the Readington Properties parcel. Bright v. Forest Hill Park Dev. Co., 31 A.2d 190, 198 (N.J. Ch. 1943); Stoebuck & Whitman, supra, at 802 ("An unexercised option is not yet . . . an interest in real property.").

The defendants say this distinction makes all the difference. Toll Brothers' option, they assert, is just a "phantom connection" to the Readington Properties parcel, and the Township's rezoning of the tract has produced "nothing more than the loss of a speculative business opportunity." Def. Br. 13. The defendants thus deride Toll Brothers' allegations as abstract claims of future

13

harm insufficient to establish injury-in-fact.  See Storino, 322 F.3d at 297.[7]

But these arguments unfairly diminish the valuable rights possessed by an optionee.  Toll Brothers has paid (and continues to pay) substantial sums to Readington Properties.  In exchange, Toll Brothers has gained the right to demand conveyance of the Readington Properties parcel for a set price at any time during the option period.  See Stoebuck & Whitman, supra, at 799-800; see also Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 864 A.2d 387, 395 (N.J. 2005).  That option is itself a valuable property right.[8]  Its value is largely dependant on the value of the Readington Properties parcel.  If the tract's market value falls, then the value of Toll Brothers' option to purchase it at a predetermined price falls with it.  And if the tract's market value falls below the option price, then the option becomes essentially valueless.  See In re Hannover Corp., 310 F.3d 796, 802 (5th Cir. 2002) ("Like all speculative financial instruments, the value of an option can change over time, depending upon the value of the underlying property.").

_____

[7]The District Court also distinguished Arlington Heights by noting that the developer there was "a non-profit organization whose primary interest [was] making low-income housing available," while Toll Brothers' "primary interest . . . is clearly economic gain."  Toll Bros., 2005 U.S. Dist. LEXIS 25793, at *12.  This distinction has no bearing on constitutional standing.  To say Toll Brothers' "primary interest . . . is clearly economic gain" is to recognize the possibility of economic injury.

[8]See Helvering v. San Joaquin Fruit & Inv. Co., 297 U.S. 496, 498 (1936) ("The option itself was property, and doubtless was valuable."); Chas. J. Smith Co. v. Anderson, 95 A. 358, 361 (N.J. Ch. 1915) (same); see also Tuecke v. Tuecke, 131 N.W.2d 794, 795 (Iowa 1964) ("[A]n option . . . is more than a mere right; it is an asset of very substantial economic value.") (quotation marks omitted); In re Estate of Niehenke, 818 P.2d 1324, 1328 (Wash. 1991) ("[A]n option to purchase real estate is a valuable and substantial property right.").

14

Toll Brothers' complaint alleges that the Township rezoned the Readington Properties parcel to "drive down [its] value" and "acquire [it] cheaply." App. 36. By driving down the value of the Readington Properties parcel, the Township has also driven down the value of Toll Brothers' option. See Hannover, 310 F.3d at 802. This harm to Toll Brothers' *own* property is a classic form of economic injury. See Danvers, 432 F.3d at 291 ("'Standing is found readily, particularly when injury to some traditional form of property is asserted.'") (quoting 13 Wright & Miller, Federal Practice and Procedure, § 3531.4, at 830 (Supp. 2005)). It satisfies the constitutional requirement of injury-in-fact.

In sum, Toll Brothers holds an exclusive option to buy the Readington Properties parcel, and the company has expended considerable sums maintaining its option, planning office and residential developments, and submitting an application to build an office park on the property. The zoning restrictions that bar Toll Brothers' planned developments have left the company unable to recoup these front-end costs, and the restrictions have also decreased the value of the company's option. These economic harms amount to legally cognizable injury-in-fact.

B.

The second requirement for Article III standing is "traceability." Pitt News v. Fisher, 215 F.3d 354, 360 (3d Cir. 2000). If the injury-in-fact prong focuses on *whether* the plaintiff suffered harm, then the traceability prong focuses on *who* inflicted that harm. The plaintiff must establish that the defendant's challenged actions, and not the actions of some third party, caused the plaintiff's injury. See Lujan, 504 U.S. at 560. This causal connection need not be as close as the proximate causation needed to succeed on the merits of a tort claim. See Pub. Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 72 (3d Cir. 1990). Rather, an indirect causal relationship will suffice, Pitt News, 215 F.3d at 361 & n.4, so long as there is "a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant," Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) (quotation marks and alterations omitted).

15

The defendants do not seriously argue that Toll Brothers fails to establish traceability. Toll Brothers challenges the defendants' rezoning of the Readington Properties parcel to "agricultural-residential." That rezoning directly caused Toll Brothers' inability to move forward with its development plans, and it directly impacted the value of Toll Brothers' option. No action of a third party is a more immediate cause of these harms. We therefore conclude that Toll Brothers easily satisfies the traceability element.

C.

Redressability is the final element of constitutional standing. This requirement is "closely related" to traceability, and the two prongs often overlap. Powell Duffryn, 913 F.2d at 73; see Dynalantic Corp. v. Dep't of Def., 115 F.3d 1012, 1017 (D.C. Cir. 1997) (describing traceability and redressability "as two sides of a causation coin"). The difference is that while traceability looks backward (did the defendants cause the harm?), redressability looks forward (will a favorable decision alleviate the harm?). See Lujan, 504 U.S. at 560-61. The redressability prong thus requires a showing that "the injury will be redressed by a favorable decision." Laidlaw, 528 U.S. at 181.

Redressability is not a demand for mathematical certainty. It is sufficient for the plaintiff to establish a "substantial likelihood that the requested relief will remedy the alleged injury in fact." Stevens, 529 U.S. at 771 (quotation marks omitted); see also Chemerinsky, supra, at § 2.3.3 (describing redressability as an "assessment[] of probability"). Arlington Heights nicely illustrates this point. As mentioned earlier, even if the developer in that case had secured an injunction against the Village's zoning practices, there still would have been no "guarantee" of the development's successful completion. See 429 U.S. at 261. The developer still would have needed "to secure financing, qualify for federal subsidies, and carry through with construction." Id. at 261. As the Court noted, though, "all housing developments are subject to some extent to similar uncertainties." Id. And it was at least more likely than not that the developer could procure the necessary federal subsidies. See id. at 261 n.7. That likelihood was enough to satisfy

16

the redressability requirement. <u>Id.</u> at 262; <u>see also</u> <u>Huntington Branch</u>, 689 F.2d at 395 (deeming the plaintiff's injury redressable where "[i]nvalidation of the challenged ordinance . . . would tangibly improve the chances of construction").

As in <u>Arlington Heights</u>, a decision striking down the Township's zoning ordinance would not "guarantee" successful completion of Toll Brothers' development plans. The District Court correctly pointed out that "even if the Court were to rule in [Toll Brothers'] favor, it need not exercise its option." <u>Toll Bros.</u>, 2005 U.S. Dist. LEXIS 25793, at *14. But just as the uncertain availability of federal subsidies did not defeat standing in <u>Arlington Heights</u>, Toll Brothers' freedom to refrain from exercising its option does not defeat standing here. The relevant question is not whether Toll Brothers *might* walk away from its development plans after receiving a favorable decision; the relevant question is whether it is *likely* to do so. <u>Stevens</u>, 529 U.S. at 771. Toll Brothers has invested large sums of money on the plans for its proposed developments. It has spent additional funds maintaining its option. And it has now spent several years litigating this dispute in state and federal court. The defendants have not provided any reason why Toll Brothers would abandon the project. Indeed, Toll Brothers has stated its intent to exercise the option and move forward with construction if and when the Township approves its plans. A favorable decision, therefore, is substantially likely to result in construction of Toll Brothers' planned developments.

Moreover, even leaving aside the likelihood of construction, a favorable decision likely will remedy the harm to Toll Brothers' option. As discussed earlier, the option itself is property. If, as Toll Brothers claims, the agricultural-residential ordinance has decreased the value of the Readington Properties parcel, then it has also decreased the value of Toll Brothers' option. An order striking down the ordinance is likely to redress that injury by increasing the value of both the underlying real property and the option. We therefore hold that Toll Brothers satisfies the redressability requirement.

D.

As the previous discussion demonstrates, Toll Brothers satisfies all three constitutional standing elements. Further buttressing that conclusion are the very separation-of-powers principles that animate the doctrine. Article III standing preserves the separation of powers by limiting federal courts to matters "'of a Judiciary nature.'" DaimlerChrysler, 547 U.S. at 342 (quoting 2 Records of the Federal Convention of 1787 430 (M. Farrand ed. 1966)). Thus, "'a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.'" Hein, 127 S. Ct. at 2563-64 (plurality opinion) (quoting Lujan, 504 U.S. at 573-74).[9]

In this case, Toll Brothers alleges the defendants "specifically identified" the company as a "target[] for their illegal enterprise." App. 44. The defendants then enacted their ordinance "to intentionally and maliciously block" Toll Brothers' development of the Readington Properties parcel. App. 47. They did this because Toll Brothers was a "disfavored" developer. App. 38.

These allegations are not even remotely akin to "generally available grievance[s]." See Hein, 127 S. Ct. at 2563-64 (plurality

---

[9]The Supreme Court has not always been consistent about whether the prohibition on "generalized grievances" is an Article III mandate or a prudential standing limitation. Compare Warth, 422 U.S. at 499 (referring to the bar on generalized grievances as "[a]part from th[e] minimum constitutional mandate"), with Lujan, 504 U.S. at 573-74 (treating it as an Article III requirement). The Court's more recent standing cases clarify that a generalized grievance is not a case or controversy under Article III. See Hein, 127 S. Ct. at 2563-64 (Alito, J., joined by Roberts, C.J., and Kennedy, J.); id. at 2582 & n.5 (Scalia, J., joined by Thomas, J., concurring in the judgment); Lance v. Coffman, 549 U.S. 437, 439-40 (2007) (per curiam).

18

opinion) (quotation marks omitted).  Rather, Toll Brothers claims
to be the specific *target* of the defendants' challenged ordinance.
The adjudication of such a dispute raises no separation-of-powers
problems at all.  See Antonin Scalia, The Doctrine of Standing as
an Essential Element of the Separation of Powers, 17 Suffolk U. L.
Rev. 881, 894 (1983) ("[W]hen an individual who is the very
*object* of a law's requirement or prohibition seeks to challenge it,
he always has standing.").

\*   \*   \*   \*

Toll Brothers has alleged cognizable injuries that are fairly
traceable to the defendants' challenged actions and likely to be
redressed by a favorable decision.  As such, the District Court erred
when it dismissed Toll Brothers' complaint for lack of Article III
standing.[10]

IV.

Toll Brothers' allegations, if true, give the company
constitutional standing to press its claims.  We will vacate the
District Court's contrary judgment and remand the case for further
proceedings, with instructions that the District Court grant Toll
Brothers leave to amend its complaint.

---

[10]We also hold that the District Court abused its discretion
by refusing to grant Toll Brothers leave to amend its complaint.
Under Federal Rule of Civil Procedure 15(a), leave to amend
should be "freely given when justice so requires," and we have
recognized that "a district court must permit a curative amendment
unless such an amendment would be inequitable or futile." Phillips
v. County of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008).  Toll
Brothers' proposed amendment would not have been inequitable
and was not futile.  In fact, the proposed amended complaint would
have, *inter alia*, added Readington Properties as a plaintiff and the
addition of that entity as a plaintiff would likely have solved any
standing problem in this case.